UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION


BOBBY MCDONALD, et al.,           )
                                  )
                Plaintiffs,       )
                                  )
        v.                        )    No.  1:04CV44 FRB
                                  )
THE CITY OF CAPE GIRARDEAU,        )
MISSOURI,                         )
                                  )
                Defendant.        )


### MEMORANDUM AND ORDER

        Presently pending before the Court is defendant City of
Cape Girardeau, Missouri's Motion for Summary Judgment (filed
October 14, 2005/Docket No. 39).  All matters are pending before
the undersigned United States Magistrate Judge, with consent of the
parties, pursuant to 28 U.S.C. § 636(c).

        Plaintiffs Bobby McDonald, Robby McDonald and McDonald &
McDonald Investments, LLC, bring this cause of action under 42
U.S.C. § 1983 alleging that defendant City of Cape Girardeau,
Missouri, engaged in systematic harassment of Plaintiffs on zoning
and building inspection issues and pretextually denied Plaintiffs'
application for liquor license renewal, in violation of Plaintiffs'
Fourteenth Amendment right to equal protection of the law and First
Amendment right of freedom of speech.  Plaintiffs also bring a
supplemental claim that Defendant's action constituted tortious
interference with contract inasmuch as Defendant's failure to renew
Plaintiffs' liquor license resulted in Plaintiffs' inability to

successfully continue operation of their business establishment.

Defendant now moves for summary judgment arguing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Plaintiffs have responded to the motion to which Defendant has replied. Pursuant to Rule 56(c), Federal Rules of Civil Procedure, a court may grant summary judgment if the information before the court shows that there are no material issues of fact in dispute and that the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The burden of proof is on the moving party to set forth the basis of its motion, Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), and the court must view all facts and inferences in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986). Once the moving party shows there are no material issues of fact in dispute, the burden shifts to the adverse party to set forth facts showing there is a genuine issue for trial. Id. The non-moving party may not rest upon its pleadings, but must come forward with affidavits or other admissible evidence to rebut the motion. Celotex, 477 U.S. at 324. Summary judgment is a harsh remedy and should not be granted unless the movant "has established [its] right to judgment with such clarity as to leave no room for controversy." New England Mutual Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir. 1977).

In compliance with Local Rule 4.01, Defendant submitted with its Motion for Summary Judgment a Statement of Uncontroverted Facts which sets forth each fact in separately numbered paragraphs, with citations to the record to establish such facts. Local Rule 4.01(E) requires that every memorandum in opposition to a motion for summary judgment

> shall include a statement of material facts as to which the party contends a genuine issue exists. Those matters in dispute shall be set forth with specific references to portions of the record, where available, upon which the opposing party relies. The opposing party also shall note for all disputed facts the paragraph number from movant's listing of facts. All matters set forth in the statement of the movant shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party.

With their Memorandum in Opposition to Defendant's motion, Plaintiffs submitted a Reply to Defendant's Statement of Uncontroverted Facts which, for purposes of the summary judgment motion, admitted all facts as set out in Defendant's Statement. Accordingly, the undersigned proceeds on the facts relevant to the instant motion as set out in Defendant's Statement of Uncontroverted Facts and as admitted by Plaintiffs in their Reply.

## I. Evidence Before the Court on the Motion

At or around 1997, plaintiff Bobby McDonald moved from Poplar Bluff, Missouri, to Cape Girardeau, Missouri. Within

approximately one year subsequent to this move, Bobby began purchasing property in Cape Girardeau for apartments and other real estate ventures. Bobby has engaged in approximately ten such projects in Cape Girardeau. With his real estate dealings and development projects, Bobby familiarized himself with the zoning codes and ordinances of the City of Cape Girardeau (the City) in relation to building and requirements. For a seven or eight year period, Bobby had no difficulty obtaining permits from the City to further his remodeling and/or refurbishing projects.

In 1999 or 2000, Bobby McDonald and his wife purchased property in Cape Girardeau for the purpose of developing a strip mall thereon and began planning with an architect for such development. Bobby did not himself check the codes or ordinances regarding how they might differ for a strip mall or bar property as opposed to apartment complexes and residential property. Instead, Bobby relied upon his engineers and architects to learn of and comply with such requirements. The property purchased by the McDonalds for the strip mall fronted Sprigg Street located to the west, and was bordered by Mason Street to the south, Olive Street to the north, and a tract of residential property located to the east owned by Martin and David Dubs. A driveway led from Mason Street to the rear of the strip mall property and the Dubs tract, and ran adjacent to residential property located on Mason Street which was the property and home of Randy Reed. Bobby McDonald

obtained permits from the City to demolish a house located at 812 Sprigg Street and then successfully obtained a change in the relevant zoning ordinance from R-4 (residential) to C-1 (commercial) for the total of the property.

At the time Bobby McDonald engaged in the initial planning of the strip mall, he determined to develop only the upper portion of the mall. When Bobby presented his plans to the City for the construction of the top level, he requested the City to issue all permits he would need for the entire mall project. Bobby planned to develop the lower portion of the mall upon attaining the Dubs property to use as a parking lot, and informed Martin Dubs that he would be interested in purchasing the Dubs property if it was ever offered for sale.

When construction began on the mall project, preliminary building plans provided for dirt to be removed from the Sprigg property and onto the Dubs tract, which either Martin or David Dubs had approved. The City approved these preliminary plans. The first unit of the strip mall opened for business in October or November 2001. Up until the time of opening the mall, Bobby McDonald had no trouble obtaining permits from or having his plans approved by the City.

At or around the end of 2001, Bobby McDonald briefly met with Jay Knudtson, Vice President at Bank of America. At the time, Bobby was close to exceeding his loan limit at Alliance Bank where

he did ninety percent of his banking.  During this meeting with Mr. Knudtson, Bobby did not provide any specific numbers regarding any proposed loan amount.  Mr. Knudtson informed Bobby that Bank of America was not presently issuing new commercial loans, but that Mr. Knudtson was soon to be vice president at a different bank and that Bobby should meet with Mr. Knudtson at that bank at a later time.  On August 1, 2002, Mr. Knudtson announced to the public that he was moving from Bank of America to First Missouri State Bank.  Mr. Knudtson moved to First Missouri State Bank on December 30, 2002.

In the meanwhile, on April 2, 2002, Mr. Knudtson was elected Mayor of the City of Cape Girardeau.

In the Spring of 2002, Bobby began plans to pursue the development of a sports bar establishment to be located within the lower portion of the strip mall.  Bobby and his brother, plaintiff Robby McDonald, formed a limited liability corporation, McDonald & McDonald Investments, LLC (MMI), for the purpose of owning and operating the sports bar.  Robby McDonald was a silent member of MMI.  In July 2002, MMI applied to the City of Cape Girardeau for a liquor license to be issued for their bar establishment, The White House Sports Bar.

On July 30, 2002, the City Manager received a written complaint from Randy Reed regarding the issuance of a liquor license to an establishment so close in proximity to his residence.

On August 5, 2002, Mr. Reed addressed the City Council and continued to voice his opposition. At this same meeting, Bobby McDonald represented to the City Council that he had an option to purchase the three-acre Dubs tract of land and that he intended to develop that property for a parking lot. Due to concerns expressed by property owners located adjacent to the McDonald property, the City Council determined to table MMI's application for liquor license.

On August 19, 2002, the City Council conditionally approved MMI's application for liquor license with the following conditions: 1. No access to or from the McDonald property, present and future, onto Mason Street; 2. Existing rock-surfaced driveway be removed from the north Mason Street right-of-way line northward for a distance of 113.45 feet; 3. No stairway on the south of the building from the upper parking lot to the lower parking. Bobby McDonald understood the conditions of MMI's liquor license. Thereafter, Bobby placed a gate across the access point from Mason Street where gravel had been removed from the driveway.

On September 9, 10 and 11, 2002, Robb McClary, Director of Inspection Services for the City, inspected the McDonald property. Mr. McClary found at that time that there continued to be access to Mason Street from the front parking lot; that the rear driveway was blocked by a chain link gate but continued to be graveled; and that there was no stairway on the south side of the

building.  Mr. McClary also noted there to be 6" minus gravel for the parking lots.  In this inspection, it was also found that Bobby was constructing a poolroom in the bar facility where a storage room had been indicated on the approved plans.  Thereafter, on September 17, 2002, Mr. McClary issued a Certificate of Occupancy for the sports bar to Bobby McDonald which included the following conditions:

> <u>City Council Conditions</u>  1. *No access from the McDonald property, present and future, onto Mason Street.*  This Certificate of Occupancy ("CO") is conditioned so this requirement is met within four weeks (midnight October 15, 2002).  Currently, the parking lot along Sprigg also connects to Mason and the connecting drive to Mason will be physically removed by October 15, 2002.  The driveway connecting to Mason at the rear has been blocked by erection of a short section of chain link fence. . . . <u>Other Conditions</u> . . . 3. <u>Parking Lot Improvements.</u>  All gravel parking areas are to be graded with a finer grade of crushed stone (1" minus) and properly graded to create a smooth surface.  The finer gravel and grading shall be completed by October 15, 2002.

(Deft.'s Exh. G, Cert. of Occupancy.)

Mr. McClary issued the conditional Certificate of Occupancy in the absence of Bobby McDonald having yet to procure the Dubs property; without such property, McDonald did not have room to access all of the parking he needed for the size of his building.  Bobby McDonald thereafter erected a single strand of barbed wire along the north side of Mason Street to block access between the McDonald mall

property and Mason Street.  Bobby also put 3/4" minus gravel on the mall's parking lot.

Mr. McClary received calls and visits on a weekly basis from adjoining property owners Randy Reed and Saundra Summers complaining about vehicles crossing to Mason Street from The White House Sports Bar.  On October 14, 2002, Mr. McClary wrote to Ms. Summers and advised that the barbed wire fence along Mason Street would be removed and that Bobby McDonald would be required to construct a solid fence to the rear and side of the property to separate the commercial from the residential tracts of land.  Under the City's zoning code and ordinances, a barrier fence was required between commercial and residential property, and barbed wire fencing was not permitted within the City.

In written communications to Bobby McDonald dated October and November 2002, Mr. McClary clarified the conditions of the Certificate of Occupancy and the liquor license, including the required removal of the barbed wire fence in accordance with City ordinance, and fire code issues.

During this period, plaintiff Bobby McDonald commenced building a wooden deck at the rear of a six-unit apartment house located at 836 North Sprigg Street, a building separate from the strip mall but located on the same tract of land.  When Bobby applied to the City for a permit for the deck construction, he was advised that he needed an architect to draw up plans for the deck

before a permit would be issued.  On or prior to October 7, 2002, Mr. McClary observed the rear deck to have been constructed on the apartment house and that the deck had an obvious sway from the weight of the wood.  Mr. McClary's office had no prior knowledge of the deck.  The City issued a Stop Work Order to Bobby McDonald and his wife on October 7, 2002, ordering the construction of the deck to cease immediately and to not resume until the required building permits were obtained.

On December 16, 2002, the City Council held a public meeting to get input from contractors on proposed changes to the Building Officials and Code Administrators (BOCA) Code being used by the City.  Bobby McDonald, as well as numerous other contractors, attended the meeting and made comments regarding the Code; specifically, Bobby expressed his opinion that a change should be made in the Code regarding basement exits and arc breakers in each bedroom.

On January 6, 2003, the McDonalds' property on North Sprigg Street was again viewed and photographs were taken of the barbed wire fence which continued to be in place despite Bobby McDonald having been told on October 6, 2002, to remove the fence. Photographs were also taken of construction debris on the property and of a sign with flashing arrows which advertised the sports bar. City Code § 30-28(10) prohibits any flashing sign or one that extends above the roof line unless against a parapet wall.  On

January 13, 2003, the City charged Bobby McDonald with the following ordinance violations upon which summonses were issued: a) failure to complete a screening fence between 820 North Sprigg and adjacent residential property; b) failure to complete storm water improvements at 820 North Sprigg[1]; c) erecting a sign without a building permit at 820 North Sprigg; d) failure to obtain a permit to erect a rear deck at 836 North Sprigg; e) violation of the BOCA Code by failure to install properly constructed porch and step rails at 836 North Sprigg; and f) accumulation of construction debris at 820 North Sprigg. Bobby removed the barbed wire fence within days of being served with the summonses for the ordinance violations.

On January 29, 2003, Bobby McDonald listed the Sprigg Street property for sale with a realtor. Bobby listed other Cape Girardeau property for sale as well on account of his belief that he was being harassed by the City as a result of the Mayor's influence.[2]

Bobby McDonald visited Mayor Knudtson at First Missouri State Bank on February 3, 2003. Bobby did not make any application for loan nor did he submit any financial data other than verbal discussion. Bobby did not tell the Mayor that he disliked Cape

---

[1]The City wrote to Bobby McDonald on June 10, 2002, and advised him of violations relating to storm water drainage onto the Dubs tract located behind the McDonalds' Sprigg Street property.

[2](Bobby McDonald Depo. at 256-57.)

Girardeau so much that he had all of his property listed with a realtor so that he could get out of the City. Bobby asserts that he rejected the banking terms offered by Mayor Knudtson during this meeting, upon which the Mayor made it clear that Bobby needed to do business with him.[3] Following this meeting, Mayor Knudtson sent an e-mail to the City Manager summarizing the meeting and suggesting that Robb McClary give Bobby some additional guidance on how to work within the system even if he did not understand the rules.[4]

Bobby McDonald asserts that the alleged harassment by the City stemmed from his refusal on February 3, 2003, to move his banking business to Mayor Knudtson's bank.

On February 14, 2003, Bobby McDonald entered into a contract with Loy Welker of Broadway Apartments for Broadway

---

[3]Bobby testified at his deposition that during this meeting, Mayor Knudtson expressed only that "it would be [to] my benefit to do banking business with him." Bobby testified that it was the "tone and stuff of his voice" which made it clear to Bobby that he needed to do business with him. (Bobby McDonald Depo. at 63-64.)

[4]Specifically, the e-mail states in relevant part:

I basically told him that the summons that he recently received was done as a way to get his attention and address a number of issues. I told him that eventhough [sic] certain policies don't make sense to him, that he must learn to work within the system as opposed to against it. . . . I did tell him [that he must] realize that he is within a city and right or wrong there are rules that must be followed that I would help facilitate a meeting with Mr. McClary and start the healing process. . . . [H]e just needs some additional guidance from the likes of Rob[.]

(Deft.'s Exh. W.)

Apartments to purchase the Sprigg Street property which housed MMI's sports bar. On March 12, 2003, Bobby McDonald closed on the purchase of the Dubs property for the purpose of constructing a parking lot to the rear of the Sprigg property. On May 14, 2003, the McDonalds and Broadway Apartments closed on their February 2003 contract. While MMI had a written lease dated September 1, 2002, from Bobby and Lula McDonald regarding the bar establishment within the mall property, MMI had no such lease with Broadway Apartments; nor was there a written assignment of the lease from Bobby and Lula McDonald to Broadway Apartments.

In the meanwhile, on April 24, 2003, MMI submitted its application to the City for renewal of its liquor license. Randy Reed submitted a letter to the City Council objecting to the requested renewal. On June 2, 2003, Mr. McClary visited the property to check on the status of compliance with the conditions previously imposed by the City. Mr. McClary noted all conditions to have been met with the exception of that which required access to be blocked between the mall property and Mason Street. The barbed wire was noted to have been removed, but nothing was erected in its place.

At the City Council's June 2, 2003, meeting, Chief of Police Steve Strong reported the presence of tire tracks to or from Mason Street to the mall property and Mr. McClary reported his efforts to work with Bobby McDonald to meet the conditions imposed

by the City, but that not all of the conditions had been met.  The City Council voted six-to-one to deny MMI's application for renewal of its liquor license.  Bobby McDonald addressed the City Council after the vote but does not recall what was said.  A Council member told Bobby after the meeting that during the Council's study session, the Mayor had convinced all of the Council members that Bobby had not met the conditions of the liquor license and "railroaded" the vote against renewal.

Bobby McDonald had no intention to submit to the City another application for renewal of MMI's liquor license after June 2, 2003.

Subsequent to June 2, 2003, for a small cost, Bobby McDonald erected a Code-approved fence which blocked access to and from Mason Street.

The City of Cape Girardeau has a charter form of government.  The Mayor is a voting member of the seven-member City Council and has no veto power.  Applications for renewal of liquor licenses are presented to the entire Council for approval or disapproval.  During 2002, there were eighty-nine liquor licenses issued by the City of Cape Girardeau subject to conditions.  During 2003, there were eighty liquor licenses issued by the City subject to conditions.

## II.  Discussion

In Count I of their Complaint, plaintiffs Bobby and Robby

McDonald and MMI allege that on account of and in retaliation for Bobby McDonald's refusal to accept Mayor Knudtson's banking terms as proposed in his capacity as Vice President of First Missouri Bank, the City of Cape Girardeau engaged in a pattern of harassment and pretextually denied MMI's request to renew its liquor license, and eventually caused Plaintiffs to withdraw from business in Cape Girardeau. Plaintiffs also claim that such action by the City of Cape Girardeau was in retaliation for Plaintiffs' outspoken criticism of City government, and specifically, Bobby McDonald's opposition to the proposed changes in the BOCA Code expressed by him at the December 2002 City Council meeting. Plaintiffs allege that such harassment and retaliatory conduct violated their Fourteenth Amendment right to equal protection of the laws and their First Amendment right of freedom of speech. In Count II of their Complaint, Plaintiffs bring a state law claim of tortious interference with contract. For the following reasons, defendant City of Cape Girardeau is entitled to judgment as a matter of law on Plaintiffs' constitutional claims.

The Fourteenth Amendment's Equal Protection Clause prohibits government officials from selectively applying laws in a discriminatory way motivated intentionally or purposefully by a person's exercise of a recognized fundamental right, suspect classification, and/or arbitrary and capricious state action. Brandt v. Davis, 191 F.3d 887, 893 (8th Cir. 1999); Central

Airlines, Inc. v. United States, 138 F.3d 333, 334-35 (8th Cir. 1998). Plaintiffs allege in their Complaint that the City unlawfully singled them out for enforcement of its codes and ordinances while approving liquor licenses for establishments which likewise committed ordinance violations and that such unlawful conduct was in retaliation for Plaintiffs' failure to move their banking business to Mayor Knudtson's bank and in retaliation for Plaintiffs' exercise of free speech. "Unequal application of the regulations . . . does not violate equal protection unless 'there is shown to be present in it an element of intentional or purposeful discrimination.'" Central Airlines, 138 F.3d at 335 (quoting Snowden v. Hughes, 321 U.S. 1, 8 (1944)). The key requirement is unlawful, purposeful discrimination. Brandt, 191 F.3d at 893.

To the extent Plaintiffs claim Defendant violated their right to equal protection on account of Plaintiffs' failure to move their banking business to Mayor Knudtson's bank, Plaintiffs have failed to demonstrate that the manner by which they conducted their banking business brought them within a protected class or constituted protected exercise of a fundamental right. Cf. Mahoney v. Doerhoff Surgical Servs., Inc., 807 S.W.2d 503, 512 (Mo. banc 1991) (suspect classification is one based on certain characteristics such as race, national origin or illegitimacy, which because of historical reasons, command extraordinary

protection from the majoritarian political process) (citing San Antonio Sch. Dist. v. Rodriguez, 411 U.S. 1, 61 (1972); Massachusetts Bd. of Ret. v. Murgia, 427 U.S. 307, 313 (1976)); State Bd. of Registration for the Healing Arts v. Giffen, 651 S.W.2d 475 (Mo. banc 1983) (setting out fundamental rights of freedom of speech, freedom of press, freedom of religion, right to vote, and right to procreate) (citing Lovell v. Griffin, 303 U.S. 444, 450 (1983); Cantwell v. Connecticut, 310 U.S. 296, 303 (1940); Reynolds v. Sims, 377 U.S. 533, 561–62 (1964); Skinner v. Oklahoma, 316 U.S. 535, 536 (1942)).

To the extent Plaintiffs contend that the City violated their equal protection rights in retaliation for Bobby McDonald's exercise of his First Amendment right of freedom of speech, this First Amendment guarantee is a recognized fundamental right and thus may constitute a basis for an equal protection claim. See Holdridge v. United States, 282 F.2d 302, 311 (8th Cir. 1960). Plaintiffs must nevertheless demonstrate, however, that the exercise of this fundamental right was the basis for being singled out by the City and for being compelled to comply with the City's ordinances "while others similarly situated were not so compelled[.]" Ellebracht v. Police Bd. of the Metro. Police Dep't of the City of St. Louis, 137 F.3d 563, 566 (8th Cir. 1998). Plaintiffs have failed to make such a showing here. Although Plaintiffs *argue* that the City treated them differently than

similarly situated persons and that the different treatment was not rationally related to a legitimate governmental objective, the Plaintiffs have provided no evidence – other than bare assertions in their Complaint – that their business establishment was similar to any other business establishment which received favorable treatment by the City under similar circumstances of ordinance violations and failure to meet conditional requirements of licensing. On this basis, Defendant is entitled to summary judgment on Plaintiffs' equal protection claim. <u>See</u> <u>Koscielski v. City of Minneapolis</u>, 435 F.3d 898, 901-02 (8th Cir. 2006); <u>see also</u> <u>Webb v. State of Mo.</u>, 777 F. Supp. 754 (E.D. Mo. 1991) (dismissing plaintiff's equal protection claim that he was denied liquor license when similarly situated competitor was granted such license, district court stated that "[a] claim that an administrative agency has made different decisions in different cases . . . does not give rise to a claim for relief on equal protection grounds.") (internal citation and quotation marks omitted).

Independent of their Fourteenth Amendment equal protection claim, however, Plaintiffs also raise a separate First Amendment claim that Defendant's harassment and the denial of liquor license renewal was in retaliation for Plaintiffs' exercise of their right of free speech, and specifically, Bobby McDonald's expressed opposition to the City's proposed changes to the BOCA

Code.  For the following reasons, this claim must fail.

To establish a First Amendment claim of retaliation under 42 U.S.C. § 1983, Plaintiffs must show that (1) they engaged in protected activity; (2) the government official(s) took adverse action against them that would chill a person of ordinary firmness from continuing in the activity; and (3) the adverse action was motivated at least in part by the exercise of the protected activity.  Revels v. Vincenz, 382 F.3d 870, 876 (8th Cir. 2004).  While opposition to government action is the type of speech intended to be protected by the First Amendment, see Naucke v. City of Park Hills, 284 F.3d 923, 927-28 (8th Cir. 2002), the undisputed evidence shows there to be no causal connection between Bobby McDonald's exercise of his First Amendment right of free speech at the City Council's December 2002 meeting and the subsequent City action in issuing summonses to Bobby in January 2003 and in determining not to renew MMI's liquor license in June 2003.

With respect to the January 2003 summonses, the evidence before the Court shows that beginning in at least June 2002, Bobby received notice that various conditions existing on the Sprigg Street property did not comply with City codes and ordinances and that despite continued notice of noncompliance, Bobby failed to remedy such conditions to bring them within the relevant code and ordinance requirements.  Such violations occurred, and Bobby received notice thereof, *prior* to the December 2002 City Council

meeting and thus *prior* to Bobby's protected speech.  The fact that the City thereafter continued in its attempt to enforce its codes and ordinances through the issuance of summonses for violations thereof is insufficient to demonstrate that the issuance of such summonses was motivated by Bobby's speech.  "[P]roceeding along lines previously contemplated, though not yet definitely determined, is no evidence whatever of causality."  <u>Clark County Sch. Dist. v. Breeden</u>, 532 U.S. 268, 372 (2001) (Title VII).  <u>See</u> <u>Hamer v. Brown</u>, 831 F.2d 1398 (8th Cir. 1987) (no causal connection shown where, <u>inter</u> <u>alia</u>, circumstances giving rise to adverse action predated protected speech).  Indeed, the government should not be precluded from continuing in its effort to enforce its rules and regulations merely because a party may have in the meanwhile engaged in protected activity.  As aptly noted by the Eighth Circuit, simply engaging in protected activity "does not clothe the complainant with immunity for past and present inadequacies[.]"  <u>Kneibert v. Thomson Newspapers, Michigan Inc.</u>, 129 F.3d 444, 455 (8th Cir. 1997) (ADEA) (internal quotation marks and citation omitted).

Plaintiffs argue, however, that the causal connection is shown here by the temporal proximity between the protected speech and the adverse action, noting that the summonses issued within one month of the December meeting.  Mere temporal proximity between protected activity and adverse action is generally insufficient to establish the causation requirement for claims of retaliation.  <u>Cf.</u>

<u>Buettner v. Arch Coal Sales Co., Inc.</u>, 216 F.3d 707, 716 (8th Cir. 2000) (Title VII) (and cases cited therein); <u>Gagnon v. Sprint Corp.</u>, 284 F.3d 839, 851-52 (8th Cir. 2002) (Title VII) (noting that a one-month lapse between the protected activity and the retaliatory act is insufficient to support a causal link alone). Indeed, courts have consistently held that temporal proximity alone is insufficient to establish causation for retaliation where, as here, it is shown that the circumstances which gave rise to the adverse action predated the protected activity. <u>Cf.</u> <u>Breeden</u>, 532 U.S. 268 (2001) (Title VII) (although transfer occurred within one month of protected activity, temporal proximity immaterial inasmuch as transfer was contemplated prior to employer's knowledge of protected activity); <u>Smith v. Allen Health Sys., Inc.</u>, 302 F.3d 827 (8th Cir. 2002) (Title VII) (evidence that employer had been concerned about problem before employee engaged in protected activity undercuts significance of temporal proximity); <u>Kneibert</u>, 129 F.3d at 455 (noting that plaintiff had received numerous reprimands prior to protected activity). As discussed above, the evidence shows that the condition in which Bobby maintained the Sprigg property prior to the December 2002 City Council meeting, and for which Bobby received notice, provided the basis for the issuance of the summonses in January 2003. Because Plaintiffs have provided no other evidence to the Court demonstrating a causal connection between the alleged protected activity and the City's

action, the mere temporal proximity of Bobby's protected speech and the issuance of the summonses is insufficient as a matter of law to show that the City was motivated by such speech in issuing the summonses.

Likewise, with respect to the City's determination in June 2003 to deny MMI's application to renew its liquor license, the undisputed evidence before the Court shows that MMI was operating under a conditional liquor license issued in August 2002 and that, beginning in at least September 2002, MMI had failed to meet all of the conditions imposed upon its license. The evidence further shows that Bobby McDonald received notice that not all of the conditions of the license had been met and that, despite such notice, he nevertheless continued to fail to undergo the steps necessary to meet them. The evidence further shows that the City continually received complaints from adjacent residential property owners that the bar continued to be accessible to vehicle traffic to and from Mason Street – in violation of MMI's conditional license – and that such information was confirmed to the City Council on June 2, 2003, by the City's Chief of Police and Inspector McClary. Based upon all of this information, the City Council denied the liquor license renewal. Other than arguing that temporal proximity alone shows the City's adverse action in June 2003 to have been motivated by Bobby's protected activity in December 2002, Plaintiffs have presented no evidence or argument

linking these events.  Cf. Dhyne v. Meiners Thriftway, Inc., 184 F.3d 983, 989 (8th Cir. 1999) (Title VII) (four-month gap between protected activity and adverse action, standing alone, weakens causal link in a retaliation claim).  This lack of causal connection is reinforced by the undisputed evidence of MMI's continued failure to meet the conditions of its liquor license previously issued, the City Council's continued receipt of complaints from adjacent residential property owners regarding the operation of the bar facility, and the separate and objective observations reported by the Chief of Police and Inspector McClary of MMI's continued violation of its conditional liquor license.  No evidence before the Court shows that the City's denial of liquor license renewal to MMI in June 2003 was motivated in any way by Bobby McDonald's comments at the December 2002 City Council meeting.  To determine otherwise based only on the temporal proximity of the actions would be nothing but rank speculation. See Caudill v. Farmland Indus., Inc., 919 F.2d 83, 86-87 (8th Cir. 1990).  While Plaintiffs are entitled to the benefit of all reasonable inferences, requiring the Court to resort to such speculation would be unreasonable.  Id. at 86.

Plaintiffs appear to raise an additional free speech argument that the City's denial of MMI's application for renewed liquor license was done in retaliation for Bobby McDonald's refusal to conduct banking business with Mayor Knudtson at First Missouri

Bank.  The Court is not aware of any authority, however, and Plaintiffs cite to none, establishing that the refusal to conduct business with a commercial bank is "protected" speech under the First Amendment.  Nevertheless, as set out above, the evidence before the Court shows the City's denial of MMI's application for renewed liquor license in June 2003 not to have been motivated by Bobby McDonald's refusal to conduct banking business with Mayor Knudtson in February 2003, but rather on account of Plaintiffs' continued failure to meet the conditions of the previously issued liquor license as well as in consideration of the complaints of resident neighbors.  Plaintiffs argue that evidence that Bobby was told by a Council member that the mayor "railroaded" the vote by the Council not to renew the license supports an inference that the Council acted in retaliation for Plaintiffs' exercise of free speech.  The undisputed facts now before the Court show that evidence before the City Council showed Plaintiffs' continued failure to meet the liquor license's conditions, with such evidence including reports by the Chief of Police and Inspector McClary and complaints from neighboring residents.  As such, to the extent that the mayor urged the Council not to renew the license, the record shows ample evidence to support such a position.  It is not a reasonable inference on the evidence now before the Court that the Council acted on account of Plaintiffs' exercise of their right of free speech, if there was one, in not doing business with First

Missouri Bank.  Caudill, 919 F.2d at 86-87.

Accordingly, for all of the foregoing reasons, defendant City of Cape Girardeau is entitled to judgment as a matter of law on Plaintiffs' claims that the City's conduct as alleged in the Complaint violated Plaintiffs' Fourteenth Amendment right to equal protection and First Amendment right of freedom of speech. Inasmuch as the Court will dismiss all claims over which it has original jurisdiction, the undersigned declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claim of tortious interference with contract.  28 U.S.C. § 1367(c)(3); see also Anderson v. Franklin County, Mo., 192 F.3d 1125, 1131 (8th Cir. 1999); American Civil Liberties Union v. City of Florissant, 186 F.3d 1095, 1098-99 (8th Cir. 1999) (when state and federal claims are joined and all federal claims are dismissed on a motion for summary judgment, state claims are ordinarily dismissed without prejudice); Willman v. Heartland Hosp. East, 34 F.3d 605, 613-14 (8th Cir. 1994) (same), cert. denied, 514 U.S. 1018 (1995).

Therefore,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (Docket No. 86) is granted with respect to Count I of Plaintiffs' Complaint.

**IT IS FURTHER ORDERED** that Count II of Plaintiffs'

Complaint is dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

Judgment shall be entered accordingly.


_Frederick R. Buckles_
UNITED STATES MAGISTRATE JUDGE



Dated this __26th__ day of April, 2006.